# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ANTHONY MARTINEZ, JEFF SOMER, TANYA DODSON, CELESTINE DARING, ROBERT FIELDS, EVA CORNELL, BILL VANHOOSE, DEBORAH ANDERSON, MIKE RIVES, DEITRICH BROADNAX, AND CONNIE HOWARD, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>ZHEJIANG HUAHAI PHARMACEUTICALS CO., LTD,<br><br>        Defendant,<br><br><br>PRINSTON PHARMACEUTICALS, INC. d/b/a SOLCO HEALTHCARE US, LLC,<br><br>        Defendant,<br><br>HUAHAI U.S.,<br><br>        Defendant,<br><br><br>HETERO LABS, LTD.,<br><br>        Defendant,<br><br><br>HETERO USA, INC.,<br><br>        Defendant, | Case No. 1:19-md-02875<br><br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>CLASS ACTION<br><br>**DEMAND FOR JURY TRIAL** |

MYLAN, INC.,

                Defendant,

MYLAN LABORATORIES, LTD.,

                Defendant,

MYLAN PHARMACEUTICALS, INC.

                Defendant,

CAMBER PHARMACEUTICALS, INC.,

                Defendant,

WALGREENS BOOTS ALLIANCE, INC.,

                Defendant,

CVS HEALTH CORPORATION,

                Defendant.

and

JOHN DOE 1-20,

                Defendant.

       Plaintiffs Anthony Martinez, Jeff Somer, Tanya Dodson, Celestine Daring, Robert Fields, Eva Cornell, Bill Vanhoose, Deborah Anderson, Mike Rives, Deitrich Broadnax, and Connie Howard  (hereinafter referred to collectively as "Plaintiffs"), individually and on behalf of all others similarly situated, alleges on personal knowledge, investigation of their counsel, and on information and belief as follows:

**NATURE OF ACTION**

1. Plaintiffs brings this action for damages and other legal and equitable remedies resulting from the actions of Zhejiang Huahai Pharmaceuticals Co., Ltd., Prinston Pharmaceuticals Inc. d/b/a Solco Healthcare US, LLC, Huahai U.S. (collectively, "Zhejiang"), Hetero Labs, Ltd., Hetero USA, Inc. (collectively, "Hetero"), Mylan, Inc., Mylan Laboratories, Ltd., Mylan Pharmaceuticals, Inc. (collectively, "Mylan") (collectively with Zhejiang and Hetero "the manufacturer Defendants"), Camber Pharmaceuticals, Inc., ("Camber"), Walgreens Boots Alliance, Inc. ("Walgreens") and CVS Health Corporation ("CVS")  (all Defendants collectively "the Defendants") in producing and distributing the drug Valsartan that was contaminated with known carcinogenic substances.  Plaintiffs represent individuals who have yet to be diagnosed with cancer as a result of taking Valsartan, and seek medical monitoring and other related remedies in order to manage the consequences of their exposure.

**JURISDICTION AND VENUE**

2. This matter in controversy exceeds $5,000,000, as each member of the proposed Class of hundreds of thousands has suffered significant future harm in the form of greatly increased risk of life-threatening diseases.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  Further, Plaintiffs allege a national class, which will result in at least one Class member belonging to a different state.  Therefore, both elements of diversity jurisdiction under the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

3. This Court has personal jurisdiction over the Defendants because, all Defendants are authorized to do business in New Jersey and the conduct at issue occurred in or was directed toward individuals in the state of New Jersey.  As a result all Defendants have established minimum contacts showing it has purposefully availed itself of the resources and protection of the State of New Jersey.

4. All proceedings stemming from or relating to the contamination of Valsartan are consolidated for pre-trial purposes in this Court pursuant to the United States

Judicial Panel on Multidistrict Litigation's Order on *In re: Valsartan N-Nitrosodimethylamine (NDMA) Contamination Products Liability Litigation*, MDL No. 2875 (February 14, 2019). Plaintiffs hereby file this case directly to the MDL pursuant to Case Management Order #3 ("CMO-3), ¶ 2.3.

      5.    Pursuant to CMO-3, ¶ 2.3, Plaintiffs designate the United States District Court for the Southern District of West Virginia as the presumptive place of remand for this action.

## **PARTIES**

      6.    Plaintiff Anthony Martinez is and at all times mentioned herein was, an individual citizen of the State of Colorado.

      7.    Plaintiff Jeff Somer is and at all times mentioned herein was, an individual citizen of the State of Colorado.

      8.    Plaintiff Tonya Dodson is and at all times mentioned herein was, an individual citizen of the State of Maryland.

      9.    Plaintiff Celestine Daring is and at all times mentioned herein was, an individual citizen of the State of Maryland.

      10.    Plaintiff Robert Fields is an at all times mentioned herein was, an individual citizen of the State of Maryland.

      11.    Plaintiff Eva Cornell is and at all times mentioned herein was, an individual citizen of the State of Arizona.

      12.    Plaintiff Bill Vanhoose is and at all times mentioned herein was, an individual citizen of the State of Indiana.

      13.    Plaintiff Deborah Anderson is an at all times mentioned herein was, an individual citizen of the State of Ohio.

      14.    Plaintiff Mike Rives is an at all times mentioned herein was, an individual citizen of the State of Illinois.

15.     Plaintiff Deitrich Broadnax is and at all times mentioned herein was, an individual citizen of the State of New Jersey.

16.     Plaintiff Connie Howard is and at all times mentioned herein was, an individual citizen of the State of West Virginia.

17.     Defendant Zhejiang Huahai Pharmaceutical Co., Ltd. is a Chinese corporation, with its principal place of business at Xunqiao, Linhai, Zhejiang 317024, China. The company also has a United States headquarters located at Cranbury, New Jersey.

18.     Prinston Pharmaceutical, Inc., dba Solco Healthcare US, LLC is a Delaware corporation, with its principal place of business in Cranbury, New Jersey.  Prinston Pharmaceutical is a fully owned subsidiary of Zhejiang Huahai Pharmaceutical.

19.     Defendant Huahai U.S., Inc. is a New Jersey corporation, with its principal place of business in Cranbury, New Jersey.  Huahai U.S. is a fully owned subsidiary of Zhejiang Huahai Pharmaceutical.

20.     Defendant Hetero Labs, Ltd. is a foreign corporation, with its principal place of business at 7-2-A2, Hetero Corporate, Industrial Estates, Sanath Nagar, Hyderabad – 500 018. Telangana, India.

21.     Defendant Hetero USA is a Delaware corporation with its principal place of business located in Piscataway, New Jersey.  Defendant Hetero USA, Inc. is "the US representation of HETERO, a privately owned; researched based global pharmaceutical company."[1]

22.     Defendant Mylan, Inc. is a Pennsylvania corporation, with its principal place of business in Canonsburg, Pennsylvania.

23.     Defendant Mylan Laboratories, Ltd. is a foreign corporation, with its principal place of business at Plot No. 564/A/22, Road No. 92, Jubilee Hills 500034, Hyderabad,

---

[1] https://www.linkedin.com/company/hetero-usa-inc/about/.

- 4 -

India.  On information and belief, Mylan Laboratories, Ltd. is a wholly-owned subsidiary of Mylan, Inc.

24.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation, with its principal place of business located in Morgantown, West Virginia.  On information and belief, Mylan Pharmaceuticals, Inc. is a wholly-owned subsidiary of Mylan Laboratories, Ltd., which in turn is owned by Mylan, Inc.

25.     Defendant Camber Pharmaceuticals, Inc. is a Delaware corporation, with its principal place of business in Piscataway, New Jersey.

26.     Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation, with its principal place of business in Deerfield, Illinois.  Walgreens Boots Alliance, Inc. is the holding company for a national chain of pharmacies operating under the Walgreens and Duane Reade tradenames.

27.     Defendant CVS Health Corporation is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island.  CVS Health Corporation is the holding company for a national chain of pharmacies operating under the CVS tradename.

28.     Defendants John Doe 1-20 are currently unknown entities that are involved in the manufacture or distribution of Valsartan as set forth in this complaint.

## NDMA AND NDEA

29.     N-nitrosodimethlyamine, commonly known as NDMA, is an odorless, yellow liquid.[2]  According to the U.S. Environmental Protection Agency, "NDMA is a semivolatile chemical that forms in both industrial and natural processes."[3]  NDMA can be unintentionally produced in and released from industrial sources through chemical reactions involving other chemicals called alkylamines.

---

[2] https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf.
[3] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

30.     The American Conference of Governmental Industrial Hygienists classifies NDMA as a confirmed animal carcinogen.[4]  The US Department of Health and Human Services (DHHS) similarly states that NDMA is reasonably anticipated to be a human carcinogen.[5]  This classification is based upon DHHS's findings that NDMA caused tumors in numerous species of experimental animals, at several different tissue sites, and by several routes of exposure, with tumors occurring primarily in the liver, respiratory tract, kidney, and blood vessels.[6]

31.     Exposure to high levels of NDMA has been linked to liver damage in humans.[7]  According to the Agency for Toxic Substances and Disease Registry, "NDMA is very harmful to the liver of humans and animals.  People who were intentionally poisoned on one or several occasions with unknown levels of NDMA in beverage or food died of severe liver damage accompanied by internal bleeding."[8]

32.     Other studies showed an increase in other types of cancers, including but not limited to, stomach, colorectal, intestinal, and other digestive tract cancers.

33.     On July 27, 2018, the FDA put out a press release, explaining the reason for its concern regarding the presence of NDMA found in valsartan-containing drugs.  In that statement, it provided, in relevant part:

> NDMA has been found to increase the occurrence of cancer in animal studies…Consuming up to 96 nanograms NDMA/day is considered reasonably safe for human ingestion. . . .

---

[4] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[5] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[6] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[7] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[8] https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf, p. 2.

The amounts of NDMA found in the recalled batches of valsartan exceeded these acceptable levels.[9]

34.     The Environmental Protection Agency classified NDMA as a probable human carcinogen "based on the induction of tumors at multiple sites in different mammal species exposed to NDMA by various routes."[10]

35.     N-Nitrosodiethylamine, often referred to as NDEA, is a yellow, oily liquid that is very soluble in water.[11]  Like NDMA, NDEA is also classified as a probable human carcinogen and a known animal carcinogen.[12]

36.     According to the U.S. Environmental Protection Agency, even short-term exposure to NDEA can damage the liver in humans.  Animal studies also demonstrate that chronic ingestion of NDEA can cause liver tumors and other types of tumors as well, including in the kidneys.  Tests conducted on rats, mice, and hamsters demonstrated that NDEA has high to extreme toxicity from oral exposure.[13]

37.     The New Jersey Department of Health notes that NDEA "should be handled as a CARCINOGEN and MUTAGEN – WITH EXTREME CAUTION."[14]  The New Jersey Department of Health also states that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."[15]

---

[9] https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm.

[10] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[11] https://www.epa.gov/sites/production/files/2016-09/documents/n-nitrosodimethylamine.pdf.

[12] https://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2018/68448a-eng.php; *see also* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620499.htm.

[13] https://www.epa.gov/sites/production/files/2016-09/documents/n-nitrosodimethylamine.pdf.

[14] https://nj.gov/health/eoh/rtkweb/documents/fs/1404.pdf (emphasis in original).

[15] https://nj.gov/health/eoh/rtkweb/documents/fs/1404.pdf.

## **VALSARTAN**

38.     Valsartan, once sold under the brand name Diovan, is used to treat high blood pressure and heart failure, and to improve a patient's chances of living longer after a heart attack.

39.     Valsartan is classified as an angiotensin receptor blocker (ARB) that is selective for the type II angiotensin receptor.  It works by relaxing blood vessels so that blood can flow more easily, thereby lowering blood pressure.  The drug binds to angiotensin type II receptors (AT1), working as an antagonist.

40.     The patents for Diovan and Diovan/hydrochlorothiazide expired in September 2012.  Shortly after the patent for Diovan expired, the FDA began to approve generic versions of Valsartan.

41.     Beginning in late 2012, the manufacturer Defendants, by and through their subsidiaries, manufactured Valsartan as a generic drug.

42.     As part of its manufacturing process, the manufacturer Defendants produced Valsartan that was contaminated with NDMA and NDEA.   Upon information and belief, the reason the manufacturer Defendants' manufacturing process produced these compounds is linked to the tetrazole group that most ARB drugs have. Solvents used to produce the tetrazole ring, such as N-Dimethylformamide (DMF), can result in the formation of drug impurities or new active ingredients, such as NDMA and NDEA, as a byproduct of the chemical reactions.[16]

43.     The pharmaceutical industry has been aware of the potential for the formation of nitrosamines in pharmaceutical drugs at least as far back as 2005.[17]

---

[16] https://www.pharmaceuticalonline.com/doc/nitroso-impurities-in-valsartan-how-did-we-miss-them-0001.

[17] http://www.pharma.gally.ch/UserFiles/File/proofs%20of%20article.pdf.

44.     The manufacturer Defendants, along with Defendants Camber, Walgreens, and CVS, marketed, distributed, and sold this contaminated and dangerous Valsartan to patients nationwide.

45.     On July 13, 2018, the Food and Drug Administration announced a recall of certain batches of valsartan-containing drugs after finding NDMA in the recalled product. The products subject to this recall were some of those which contained the active pharmaceutical ingredient (API) supplied by Zhejiang Huahai Pharmaceuticals."[18]  FDA further noted that the valsartan-containing drugs being recalled "does not meet our safety standards."[19]  The recall was limited to "all lots of non-expired products that contain the ingredient valsartan supplied to them by [the Active Pharmaceutical Manufacturer (API)] supplied by this specific company."

46.     The recall notice further stated, "Zhejiang Huahai Pharmaceuticals has stopped distributing its valsartan API and the FDA is working with the affected companies to reduce or eliminate the valsartan API impurity from future products."[20]

47.     On July 18, 2018, FDA put out another press release about the recall, noting its determination that "the recalled valsartan products pose an unnecessary risk to patients."[21]

48.     As of September 28, 2018, FDA placed Zhejiang Huahai Pharmaceuticals Co, Ltd. on import alerts, which halted all API made by the company from entering the United States.  This was the product of an inspection of Zhejiang Huahai's facility.[22]  FDA's recall notice also stated that the presence of NDMA in the valsartan-containing drugs was "thought to be related to changes in the way the active substance was manufactured."[23]

---

[18] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm613532.htm.

[19] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm613532.htm.

[20] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm613532.htm.

[21] https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm.

[22] https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/CDERFOIA ElectronicReadingRoom/UCM621162.pdf.

[23] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm613532.htm.

49.     After the initial recall in July, 2018, the list of valsartan-containing medications discovered to contain NDMA continued to grow.  On August 9, 2018, FDA announced that it was expending the recall to include valsartan-containing products manufactured by another API manufacturers, Hetero Labs Limited, labeled as Camber Pharmaceuticals, Inc., as these recalled pills also contained unacceptable levels of NDMA.[24] FDA noted, "Hetero Labs manufactures the API for the Camber products using a process similar to Zhejiang Huahai Pharmaceuticals."[25]

50.     On October 5, 2018, FDA posted the results of some testing conducted on samples of recalled valsartan tablets.  Noting that "consuming up to 0.096 micrograms of NDMA per day is considered reasonably safe for human ingestion based on lifetime exposure," the results of the testing showed levels ranging from 0.3 micrograms up to 17 micrograms.[26]  Thus, the pills contained somewhere between 3.1 and 177 times the level of NDMA deemed safe for human consumption.  Subsequent testing revealed levels as high as 20 micrograms, which is 208.3 times the safe level.

51.     On November 21, 2018, FDA announced a new recall, this time because NDEA was detected in the tablets.  Additional recalls of valsartan-containing tablets which were found to contain NDEA followed.  These recall notices also stated that the recalls related to unexpired valsartan-containing products.[27]

52.     Over the course of the fall and winter of 2018, NDMA and NDEA continued to be detected across so many brands of valsartan and other ARB drugs that the FDA imposed interim limits for NDMA and NDEA in ARBs to prevent drug shortages.  In doing so, FDA reminded "manufacturers that they are responsible for developing and using suitable methods to detect impurities, including when they make changes to their manufacturing

---

[24] https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm.

[25] https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm.

[26] https://www.fda.gov/Drugs/DrugSafety/ucm622717.htm.

[27] https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm.

- 10 -

processes.  If a manufacturer detects a new impurity or high level of impurities, they should fully evaluate the impurities and take action to ensure the product is safe for patients."[28]

53.     The European Medicines Agency (EMA) also recalled many batches of valsartan-containing drugs.  According to the agency, "[t]he review of valsartan medicines was triggered by the European Commission on 5 July 2018…On 20 September 2018, the review was extended to include medicines containing cadesartan, Irbesartan, losartan and Olmesartan."[29]  In light of the EMA's findings, Zhejiang Huahai Pharmaceutical Co., Ltd., is not presently authorized to produce valsartan for medications distributed in the European Union.[30]

54.     Health Canada also issued a recall of valsartan-containing medications on July 9, 2018, noting the presence of NDMA as the reason.  Health Canada similarly stated that NDMA is a potential human carcinogen.[31]

## FRAUDULENT CONCEALMENT

55.     Defendants have kept Plaintiffs and their physicians ignorant of information necessary to the pursuit of claims, until such time as the information became publicly available in late 2018.  Plaintiffs and Plaintiffs' health care providers did not have the means to test for possible contamination in the valsartan tablets manufactured and distributed by Defendants, and thus could not have reasonably discovered their claims.

56.     Defendants were obligated to disclose facts relating to possible contamination that were in their possession as they obtained this information.  The failure to do so constitutes intentional conduct that was done without regard to the rights and medical condition of Plaintiffs and other similarly situated persons.

---

[28] https://www.fda.gov/Drugs/DrugSafety/ucm613916.htm.

[29] https://www.ema.europa.eu/en/medicines/human/referrals/angiotensin-ii-receptor-antagonists-sartans-containing-tetrazole-group.

[30] https://www.ema.europa.eu/en/news/update-review-valsartan-medicines.

[31] http://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2018/67202a-eng.php#issue-problem.

57.     Any applicable statutes of limitation have been tolled, and Defendants are estopped from the relying on such limitations periods as a defense, by the knowing and active concealment of material facts known by Defendants, where Defendants had a duty to disclose those facts as they obtained them.

## FACTS RELATING TO THE NAMED PLAINTIFFS

### Plaintiff Martinez

58.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

59.     Beginning in 2014, Plaintiff Martinez was prescribed and took Valsartan at the direction of his physician for high blood pressure, at a dose of 160 mg per day.

60.     As of the present time, Plaintiff Martinez has not been diagnosed with cancer.  However, in light of his significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Martinez has undertaken additional efforts to monitor his medical condition.

### Plaintiff Somer

61.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

62.     Beginning in 2014, Plaintiff Somer was prescribed and took Valsartan at the direction of his physician for high blood pressure, at a dose of 150 mg per day, which was in 2018 doubled to 300 mg per day.

63.     As of the present time, Plaintiff Somer has not been diagnosed with cancer.  However, in light of his significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Somer has undertaken additional efforts to monitor his medical condition.

**Plaintiff Dodson**

64.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

65.     Beginning in 2014, Plaintiff Dodson was prescribed and took Valsartan at the direction of her physician for high blood pressure, at a dose of 100 mg per day.

66.     As of the present time, Plaintiff Dodson has not been diagnosed with cancer.  However, in light of her significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Dodson has undertaken additional efforts to monitor her medical condition.

**Plaintiff Daring**

67.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

68.     Beginning in 2012, Plaintiff Daring was prescribed and took Valsartan at the direction of her physician for high blood pressure, at a dose of 320 mg per day.

69.     As of the present time, Plaintiff Daring has not been diagnosed with cancer.  However, in light of her significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Daring has undertaken additional efforts to monitor her medical condition.

**Plaintiff Fields**

70.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

71.     Beginning in 2014 through 2018, Plaintiff Fields was prescribed and took Valsartan at the direction of his physician for high blood pressure, at a dose of 320 mg per day.

72.     Plaintiff Fields obtained her Valsartan primarily through CVS pharmacies in her area

73.     As of the present time, Plaintiff Fields has not been diagnosed with cancer. However, in light of his significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Fields has undertaken additional efforts to monitor his medical condition.

**Plaintiff Cornell**

74.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

75.     Beginning in 2014, Plaintiff Cornell was prescribed and took Valsartan at the direction of her physician for high blood pressure, at a dose of 120 mg per day.

76.     Plaintiff Cornell obtained her Valsartan primarily through Walgreens pharmacies in her area.

77.     As of the present time, Plaintiff Cornell has not been diagnosed with cancer.  However, in light of her significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Cornell has undertaken additional efforts to monitor her medical condition.

**Plaintiff Vanhoose**

78.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

79.     Beginning in 2018, Plaintiff Vanhoose was prescribed and took Valsartan at the direction of his physician for high blood pressure, at a dose of 100 mg per day.

80.     As of the present time, Plaintiff Vanhoose has not been diagnosed with cancer.  However, in light of his significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Vanhoose has undertaken additional efforts to monitor his medical condition.

**Plaintiff Broadnax**

81.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

82.     Beginning in 2012, Plaintiff Broadnax was prescribed and took Valsartan at the direction of his physician for high blood pressure, at a dose of 100 mg or 125 mg per day.

83.     As of the present time, Plaintiff Broadmaz has not been diagnosed with cancer.  However, in light of his significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Broadnax has undertaken additional efforts to monitor his medical condition.

**Plaintiff Howard**

84.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

85.     Beginning in 2016, Plaintiff Howard was prescribed and took Valsartan at the direction of her physician for high blood pressure, at a dose of 320 mg per day.

86.     As of the present time, Plaintiff Howard has not been diagnosed with cancer.  However, in light of her significantly increased risk of contracting cancer as a result of prolonged exposure to contaminated Valsartan, Plaintiff Howard has undertaken additional efforts to monitor her medical condition.

## JOINT AND SEVERAL LIABILITY

87.     At the present time, Plaintiffs do not know the source of the contaminated Valsartan that they took, or whether it was from one or multiple sources, except that it was manufactured by one of the manufacturer Defendants.

88.     Regardless of the particular manufacturer of the particular batches of contaminated Valsartan taken by Plaintiffs, the manufacturer Defendants have all placed substantially similar products into the stream of commerce, products that contain toxic NDMA and NDEA.

89.     As set forth below, members of the proposed Class and Subclasses have taken those products, and have thus suffered a substantially increased risk of contracting cancer and/or other life-threatening diseases.

90.     Thus, collectively, the manufacturer Defendants are the legal and proximate causes of the injuries suffered by Plaintiffs and the proposed Class and Subclasses.

91.     Camber, Walgreens, and CVS distributed the contaminated Valsartan that was placed into the stream of commerce by the manufacturer Defendants.

92.     As such, collectively, Camber, Walgreens, and CVS are the legal and proximate causes of the injuries suffered by Plaintiffs and the proposed Class and Subclasses.

93.     As such, the Defendants as a whole are jointly and severally liable for all damages suffered by the Plaintiffs and the proposed Class and Subclasses, and should be responsible for the relief as set forth below.

## CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action on behalf of herself and all other persons similarly situated (hereinafter referred to as "the Class").

95.     Plaintiffs propose the following Class definition, subject to amendment as appropriate:

All persons within the United States who took the drug Valsartan

> manufactured by the manufacturer Defendants and who do not
> have a diagnosis of cancer that has been attributed to Valsartan as
> of the filing of this complaint.

Collectively, these persons will be referred to as "Class members."  Plaintiffs Martinez, Somer,

Dodson, Daring, Fields, Cornell, Vanhoose, Anderson, Rives, Broadnax and Howard represent,

and are members of, the Class.  Excluded from the Class are all Defendants, any entities in which

a Defendant has a controlling interest, any agents and employees of any Defendant, any Judge to

whom this action is assigned and any member of such Judge's staff and immediate family, and

claims for economic loss.

      96.    Plaintiffs Martinez and Somer also propose the following Subclass

definition, hereafter known as the "Colorado Subclass," subject to amendment as appropriate:

> All residents of the State of Colorado who took the drug Valsartan
> manufactured by the manufacturer Defendants and who do not
> have a diagnosis of cancer that has been attributed to Valsartan as
> of the filing of this complaint.

Collectively, these persons will be referred to as "Colorado Subclass members."  Plaintiffs

Martinez and Somer represent, and are members of, the Colorado Subclass.  Excluded from the

Class are all Defendants, any entities in which a Defendant has a controlling interest, any agents

and employees of any Defendant, any Judge to whom this action is assigned and any member of

such Judge's staff and immediate family, and claims for economic loss.

      97.    Plaintiffs Dodson, Daring, and Fields also propose the following

Subclass definition, hereafter known as the "Maryland Subclass," subject to amendment as

appropriate:

> All residents of the State of Maryland who took the drug Valsartan
> manufactured by the manufacturer Defendants and who do not
> have a diagnosis of cancer that has been attributed to Valsartan as
> of the filing of this complaint.

Collectively, these persons will be referred to as "Maryland Subclass members."  Plaintiffs

Dodson, Daring, and Fields represent, and are members of, the Maryland Subclass.  Excluded

from the Class are all Defendants, any entities in which a Defendant has a controlling interest, any agents and employees of any Defendant, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and claims for economic loss.

98. Plaintiff Cornell also proposes the following Subclass definition, hereafter known as the "Arizona Subclass," subject to amendment as appropriate:

> All residents of the State of Arizona who took the drug Valsartan manufactured by the manufacturer Defendants and who do not have a diagnosis of cancer that has been attributed to Valsartan as of the filing of this complaint.

Collectively, these persons will be referred to as "Arizona Subclass members." Plaintiff Cornell represents, and is a member of, the Arizona Subclass. Excluded from the Class are all Defendants, any entities in which a Defendant has a controlling interest, any agents and employees of any Defendant, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and claims for economic loss.

99. Plaintiff Vanhoose also proposes the following Subclass definition, hereafter known as the "Arizona Subclass," subject to amendment as appropriate:

> All residents of the State of Indiana who took the drug Valsartan manufactured by the manufacturer Defendants and who do not have a diagnosis of cancer that has been attributed to Valsartan as of the filing of this complaint.

Collectively, these persons will be referred to as "Indiana Subclass members." Plaintiff Vanhoose represents, and is a member of, the Indiana Subclass. Excluded from the Class are all Defendants, any entities in which a Defendant has a controlling interest, any agents and employees of any Defendant, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and claims for economic loss.

100. Plaintiff Anderson also proposes the following Subclass definition, hereafter known as the "Ohio Subclass," subject to amendment as appropriate:

> All residents of the State of Ohio who took the drug Valsartan

manufactured by the manufacturer Defendants and who do not
have a diagnosis of cancer that has been attributed to Valsartan as
of the filing of this complaint.

Collectively, these persons will be referred to as "Ohio Subclass members."  Plaintiff Anderson

represents, and is a member of, the Indiana Subclass.  Excluded from the Class are all

Defendants, any entities in which a Defendant has a controlling interest, any agents and

employees of any Defendant, any Judge to whom this action is assigned and any member of such

Judge's staff and immediate family, and claims for economic loss.

        101.    Plaintiff Rives also proposes the following Subclass definition, hereafter

known as the "Illinois Subclass," subject to amendment as appropriate:

All residents of the State of Illinois who took the drug Valsartan
manufactured by the manufacturer Defendants and who do not
have a diagnosis of cancer that has been attributed to Valsartan as
of the filing of this complaint.

Collectively, these persons will be referred to as "Illinois Subclass members."  Plaintiff Rives

represents, and is a member of, the Indiana Subclass.  Excluded from the Class are all

Defendants, any entities in which a Defendant has a controlling interest, any agents and

employees of any Defendant, any Judge to whom this action is assigned and any member of such

Judge's staff and immediate family, and claims for economic loss.

        102.    Plaintiff Broadnax also proposes the following Subclass definition,

hereafter known as the "New Jersey Subclass," subject to amendment as appropriate:

All residents of the State of New Jersey who took the drug
Valsartan manufactured by the manufacturer Defendants and who
do not have a diagnosis of cancer that has been attributed to
Valsartan as of the filing of this complaint.

Collectively, these persons will be referred to as "New Jersey Subclass members."  Plaintiff

Broadnax represents, and is a member of, the New Jersey Subclass.  Excluded from the Class are

all Defendants, any entities in which a Defendant has a controlling interest, any agents and

employees of any Defendant, any Judge to whom this action is assigned and any member of such

Judge's staff and immediate family, and claims for economic loss.

103. Plaintiff Howard also proposes the following Subclass definition, hereafter known as the "West Virginia Subclass," subject to amendment as appropriate:

> All residents of the State of West Virginia who took the drug Valsartan manufactured by the manufacturer Defendants and who do not have a diagnosis of cancer that has been attributed to Valsartan as of the filing of this complaint.

Collectively, these persons will be referred to as "West Virginia Subclass members." Plaintiff Howard represents, and is a member of, the West Virginia Subclass. Excluded from the West Virginia Subclass are all Defendants, any entities in which a Defendant has a controlling interest, any agents and employees of any Defendant, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and claims for economic loss.

104. Plaintiffs do not know the exact number of members in the Class and Subclasses, but Plaintiffs reasonably believes that Class members number at minimum in the thousands.

105. Plaintiffs and all members of the Class have been harmed by the acts of the Defendants, because they are subject to significantly increased risk of cancer and other life-threatening diseases as a result of exposure to the contaminated medications produced and distributed by Defendants.

106. This Class Action Complaint seeks injunctive relief and money damages.

107. The joinder of all Class members is impracticable due to the size of the Class and Subclasses and relatively modest value of each individual claim. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified easily through records maintained by Defendants or third-parties such as pharmacies.

108. There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact involving the class claims predominate over

questions which may affect individual Class members.  Those common questions of law and fact include, but are not limited to, the following:

>        a.      Whether the manufacturing Defendants produced Valsartan that was contaminated with NDMA and/or NDEA;

>        b.      Whether Camber, Walgreens, and CVS distributed Valsartan that was contaminated with NDMA and/or NDEA;

>        c.      Whether the Defendants were negligent in their manufacture or distribution of the contaminated Valsartan;

>        d.      Whether the Defendants were negligent per se in their manufacture or distribution of the contaminated Valsartan;

>        e.      Whether the Defendants' conduct was knowing and/or willful; and

>        f.      Whether the Defendants should be required to provide medical monitoring relief on a going-forward basis.

109.     As persons who took Valsartan and who are at increased risk of developing life-threatening diseases as a result of taking Valsartan, Plaintiffs assert claims that are typical of each Class member.  Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses, and has no interests which are antagonistic to any member of the Class or Subclasses.

110.     Plaintiffs have retained counsel experienced in handling class action claims on behalf of a wide variety of types of consumers all over the country.

111.     A class action is the superior method for the fair and efficient adjudication of this controversy.  Classwide relief is essential to insure that all individuals who have been exposed to contaminated Valsartan have access to appropriate and necessary medical care.  The interest of Class members in individually controlling the prosecution of separate claims against the Defendants is small because of the uncertainty as to the origin point of the particular Valsartan dose.  Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because relief is standardized across all class members.

112.    The Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

## CAUSES OF ACTION

## FIRST COUNT

## DEFECTIVE PRODUCT
**(On Behalf of the Class Against All Defendants)**

113.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

114.    The Defendants, collectively, manufactured and distributed Valsartan in an unreasonably dangerous and defective condition and/or placed this dangerous and defective product into the stream of commerce knowing it would be taken by patients, including Plaintiffs and members of the proposed Class.

115.    The Valsartan manufactured and distributed by the Defendants was defective in that, when placed in the stream of commerce, (1) the foreseeable risks exceeding the benefits associated with consumption; (2) the contaminated Valsartan was more dangerous than the ordinary consumer, including Plaintiffs and the Class they seek to represent, would expect, and more dangerous than other alternatives (such as brand-named Valsartan and other similar blood pressure medications); (3) there were no warnings provided about the dangerous nature of the product; and (4) the contaminated drugs were not properly tested, if tested at all.

116.    As a result of the dangerous nature of the product, and the lack of warning provided by the Defendants as to its dangerous nature, the Defendants are strictly liable to Plaintiffs and the Class as set forth below.

## SECOND COUNT

## NEGLIGENCE
**(On Behalf of the Colorado Subclass Against All Defendants)**

117.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

118.     Each person who has taken contaminated Valsartan, as a result of the tortious conduct of the Defendants, has been exposed to dangerous and carcinogenic compounds in the form of NDMA and NDEA.

119.     NDMA and NDEA are proven hazardous substances that have been shown to have a probable link to human disease, including liver and kidney cancer.

120.     Each person who has been exposed to NDMA and NDEA via contaminated Valsartan has a significantly increased risk of contracting one or more serious latent diseases relative to what would be the case in the absence of such exposure.

121.     The increases risk of serious latent disease described above makes it reasonably necessary to each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

122.     Monitoring procedures exist that make possible the early detection of the diseases that have been linked to NDMA and NDEA exposure.

123.     To safeguard their health against life-threatening diseases that Plaintiffs Martinez, Somer, and the Colorado Subclass members are now at greater risk of contracting, Plaintiffs Martinez, Somer, and the Colorado Subclass will suffer annoyance, fear, humiliation, embarrassment, and the cost in time and effort of monitoring their health status.  These damages are a proximate result of the acts and omissions of the Defendants.

124.     Diagnostic and/or monitoring procedures exist that comport with scientific principles and the standard of care that make possible early detection of potential injury to Plaintiffs Martinez, Somer, and the Colorado Subclass.  This early detection would not be possible without the implementation of such procedures.  The proposed Court-supervised program includes, but is not limited to, baseline exams and periodic diagnostic exams.

125.     As such, Plaintiffs Martinez, Somer, and members of the Colorado

Subclass seek the formation of a medical monitoring fund to pay for the costs and expenses of

medical monitoring for Plaintiff Martinez, Somer and members of the Colorado Subclass.

### THIRD COUNT

### NEGLIGENCE
### (On Behalf of the Maryland Subclass Against All Defendants)

126.     Plaintiffs incorporate by reference the foregoing paragraphs of this

Complaint as if fully set forth herein.

127.     Each person who has taken contaminated Valsartan, as a result of the

tortious conduct of the Defendants, has been exposed to dangerous and carcinogenic

compounds in the form of NDMA and NDEA.

128.     NDMA and NDEA are proven hazardous substances that have been shown

to have a probable link to human disease, including liver and kidney cancer.

129.     Each person who has been exposed to NDMA and NDEA via

contaminated Valsartan has a significantly increased risk of contracting one or more serious

latent diseases relative to what would be the case in the absence of such exposure.

130.     The increases risk of serious latent disease described above makes it

reasonably necessary to each person so exposed to undergo periodic diagnostic medical

examinations different from what would be prescribed in the absence of such exposure.

131.     Monitoring procedures exist that make possible the early detection of the

diseases that have been linked to NDMA and NDEA exposure.

132.     To safeguard their health against life-threatening diseases that Plaintiffs

Dodson, Daring, Fields, and the Maryland Subclass members are now at greater risk of

contracting, Plaintiffs Dodson, Daring, Fields and the Maryland Subclass will suffer annoyance,

fear, humiliation, embarrassment, and the cost in time and effort of monitoring their health

status.  These damages are a proximate result of the acts and omissions of the Defendants.

133.     Diagnostic and/or monitoring procedures exist that comport with scientific principles and the standard of care that make possible early detection of potential injury to Plaintiffs Dodson, Daring, Fields, and the Maryland Subclass.  This early detection would not be possible without the implementation of such procedures.  The proposed Court-supervised program includes, but is not limited to, baseline exams and periodic diagnostic exams.

134.     As such, Plaintiffs Dodson, Daring, Fields and members of the Maryland Subclass seek the formation of a medical monitoring fund to pay for the costs and expenses of medical monitoring for Plaintiff Dodson, Daring, Fields, and members of the Maryland Subclass.

## FOURTH COUNT

### NEGLIGENCE
### (On Behalf of the Arizona Subclass Against All Defendants)

135.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

136.     Each person who has taken contaminated Valsartan, as a result of the tortious conduct of the Defendants, has been exposed to dangerous and carcinogenic compounds in the form of NDMA and NDEA.

137.     NDMA and NDEA are proven hazardous substances that have been shown to have a probable link to human disease, including liver and kidney cancer.

138.     Each person who has been exposed to NDMA and NDEA via contaminated Valsartan has a significantly increased risk of contracting one or more serious latent diseases relative to what would be the case in the absence of such exposure.

139.     The increases risk of serious latent disease described above makes it reasonably necessary to each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

140.     Monitoring procedures exist that make possible the early detection of the diseases that have been linked to NDMA and NDEA exposure.

141.    To safeguard their health against life-threatening diseases that Plaintiff Cornell and the Arizona Subclass members are now at greater risk of contracting, Plaintiff Cornell and the Arizona Subclass will suffer annoyance, fear, humiliation, embarrassment, and the cost in time and effort of monitoring their health status.  These damages are a proximate result of the acts and omissions of the Defendants.

142.    Diagnostic and/or monitoring procedures exist that comport with scientific principles and the standard of care that make possible early detection of potential injury to Plaintiff Cornell, and the Arizona Subclass.  This early detection would not be possible without the implementation of such procedures.  The proposed Court-supervised program includes, but is not limited to, baseline exams and periodic diagnostic exams.

143.    As such, Plaintiff Cornell and members of the Arizona Subclass seek the formation of a medical monitoring fund to pay for the costs and expenses of medical monitoring for Plaintiff Cornell and members of the Arizona Subclass.

## FIFTH COUNT

### NEGLIGENCE
### (On Behalf of the Indiana Subclass Against All Defendants)

144.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

145.    Each person who has taken contaminated Valsartan, as a result of the tortious conduct of the Defendants, has been exposed to dangerous and carcinogenic compounds in the form of NDMA and NDEA.

146.    NDMA and NDEA are proven hazardous substances that have been shown to have a probable link to human disease, including liver and kidney cancer.

147.    Each person who has been exposed to NDMA and NDEA via contaminated Valsartan has a significantly increased risk of contracting one or more serious latent diseases relative to what would be the case in the absence of such exposure.

148.     The increases risk of serious latent disease described above makes it reasonably necessary to each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

149.     Monitoring procedures exist that make possible the early detection of the diseases that have been linked to NDMA and NDEA exposure.

150.     To safeguard their health against life-threatening diseases that Plaintiff Vanhoose and the Indiana Subclass members are now at greater risk of contracting, Plaintiff Vanhoose and the Indiana Subclass will suffer annoyance, fear, humiliation, embarrassment, and the cost in time and effort of monitoring their health status.  These damages are a proximate result of the acts and omissions of the Defendants.

151.     Diagnostic and/or monitoring procedures exist that comport with scientific principles and the standard of care that make possible early detection of potential injury to Plaintiff Vanhoose, and the Indiana Subclass.  This early detection would not be possible without the implementation of such procedures.  The proposed Court-supervised program includes, but is not limited to, baseline exams and periodic diagnostic exams.

152.     As such, Plaintiff Vanhoose and members of the Indiana Subclass seek the formation of a medical monitoring fund to pay for the costs and expenses of medical monitoring for Plaintiff Vanhoose and members of the Indiana Subclass.

## SIXTH COUNT

### NEGLIGENCE
### (On Behalf of the Ohio Subclass Against All Defendants)

153.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

154.     Each person who has taken contaminated Valsartan, as a result of the tortious conduct of the Defendants, has been exposed to dangerous and carcinogenic compounds in the form of NDMA and NDEA.

155.     NDMA and NDEA are proven hazardous substances that have been shown to have a probable link to human disease, including liver and kidney cancer.

156.     Each person who has been exposed to NDMA and NDEA via contaminated Valsartan has a significantly increased risk of contracting one or more serious latent diseases relative to what would be the case in the absence of such exposure.

157.     The increases risk of serious latent disease described above makes it reasonably necessary to each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

158.     Monitoring procedures exist that make possible the early detection of the diseases that have been linked to NDMA and NDEA exposure.

159.     To safeguard their health against life-threatening diseases that Plaintiff Anderson and the Ohio Subclass members are now at greater risk of contracting, Plaintiff Anderson and the Ohio Subclass will suffer annoyance, fear, humiliation, embarrassment, and the cost in time and effort of monitoring their health status.  These damages are a proximate result of the acts and omissions of the Defendants.

160.     Diagnostic and/or monitoring procedures exist that comport with scientific principles and the standard of care that make possible early detection of potential injury to Plaintiff Anderson, and the Ohio Subclass.  This early detection would not be possible without the implementation of such procedures.  The proposed Court-supervised program includes, but is not limited to, baseline exams and periodic diagnostic exams.

161.     As such, Plaintiff Anderson and members of the Ohio Subclass seek the formation of a medical monitoring fund to pay for the costs and expenses of medical monitoring for Plaintiff Anderson and members of the Ohio Subclass.

**<u>SEVENTH COUNT</u>**

**NEGLIGENCE**
**(On Behalf of the Illinois Subclass Against All Defendants)**

- 28 -

162.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

163.    Each person who has taken contaminated Valsartan, as a result of the tortious conduct of the Defendants, has been exposed to dangerous and carcinogenic compounds in the form of NDMA and NDEA.

164.    NDMA and NDEA are proven hazardous substances that have been shown to have a probable link to human disease, including liver and kidney cancer.

165.    Each person who has been exposed to NDMA and NDEA via contaminated Valsartan has a significantly increased risk of contracting one or more serious latent diseases relative to what would be the case in the absence of such exposure.

166.    The increases risk of serious latent disease described above makes it reasonably necessary to each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

167.    Monitoring procedures exist that make possible the early detection of the diseases that have been linked to NDMA and NDEA exposure.

168.    To safeguard their health against life-threatening diseases that Plaintiff Rives and the Illinois Subclass members are now at greater risk of contracting, Plaintiff Rives and the Illinois Subclass will suffer annoyance, fear, humiliation, embarrassment, and the cost in time and effort of monitoring their health status.  These damages are a proximate result of the acts and omissions of the Defendants.

169.    Diagnostic and/or monitoring procedures exist that comport with scientific principles and the standard of care that make possible early detection of potential injury to Plaintiff Rives and the Illinois Subclass.  This early detection would not be possible without the implementation of such procedures.  The proposed Court-supervised program includes, but is not limited to, baseline exams and periodic diagnostic exams

- 29 -

170.     As such, Plaintiff Rives and members of the Illinois Subclass seek the formation of a medical monitoring fund to pay for the costs and expenses of medical monitoring for Plaintiff Rives and members of the Illinois Subclass.

## EIGHTH COUNT

### NEGLIGENCE
### (On Behalf of the New Jersey Subclass Against All Defendants)

171.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

172.     Each person who has taken contaminated Valsartan, as a result of the tortious conduct of the Defendants, has been exposed to dangerous and carcinogenic compounds in the form of NDMA and NDEA.

173.     NDMA and NDEA are proven hazardous substances that have been shown to have a probable link to human disease, including liver and kidney cancer.

174.     Each person who has been exposed to NDMA and NDEA via contaminated Valsartan has a significantly increased risk of contracting one or more serious latent diseases relative to what would be the case in the absence of such exposure.

175.     The increases risk of serious latent disease described above makes it reasonably necessary to each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

176.     Monitoring procedures exist that make possible the early detection of the diseases that have been linked to NDMA and NDEA exposure.

177.     To safeguard their health against life-threatening diseases that Plaintiff Broadnax and the New Jersey Subclass members are now at greater risk of contracting, Plaintiff Broadnax and the New Jersey Subclass will suffer annoyance, fear, humiliation, embarrassment, and the cost in time and effort of monitoring their health status.  These damages are a proximate result of the acts and omissions of the Defendants.

178.     Diagnostic and/or monitoring procedures exist that comport with scientific principles and the standard of care that make possible early detection of potential injury to Plaintiff Broadnax and the New Jersey Subclass.  This early detection would not be possible without the implementation of such procedures.  The proposed Court-supervised program includes, but is not limited to, baseline exams and periodic diagnostic exams.

179.     As such, Plaintiff Broadnax and members of the New Jersey Subclass seek the formation of a medical monitoring fund to pay for the costs and expenses of medical monitoring for Plaintiff Broadnax and members of the New Jersey Subclass.

## NINTH COUNT

**MEDICAL MONITORING**
**(On Behalf of the West Virginia Subclass Against All Defendants)**

180.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

181.     Each person who has taken contaminated Valsartan, as a result of the tortious conduct of the Defendants, has been exposed to dangerous and carcinogenic compounds in the form of NDMA and NDEA.

182.     NDMA and NDEA are proven hazardous substances that have been shown to have a probable link to human disease, including liver and kidney cancer.

183.     Each person who has been exposed to NDMA and NDEA via contaminated Valsartan has a significantly increased risk of contracting one or more serious latent diseases relative to what would be the case in the absence of such exposure.

184.     The increases risk of serious latent disease described above makes it reasonably necessary to each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

185.     Monitoring procedures exist that make possible the early detection of the diseases that have been linked to NDMA and NDEA exposure.

186.    To safeguard their health against life-threatening diseases that Plaintiff Howard and the West Virginia Subclass members are now at greater risk of contracting, Plaintiff Howard and the West Virginia Subclass will suffer annoyance, fear, humiliation, embarrassment, and the cost in time and effort of monitoring their health status.  These damages are a proximate result of the acts and omissions of the Defendants.

187.    Diagnostic and/or monitoring procedures exist that comport with scientific principles and the standard of care that make possible early detection of potential injury to Plaintiff Howard, and the West Virginia Subclass.  This early detection would not be possible without the implementation of such procedures.  The proposed Court-supervised program includes, but is not limited to, baseline exams and periodic diagnostic exams.

188.    As such, Plaintiff Howard and members of the West Virginia Subclass seek the formation of a medical monitoring fund to pay for the costs and expenses of medical monitoring for Plaintiff Howard and members of the West Virginia Subclass.

## TENTH COUNT

### NEGLIGENCE *PER SE*
### (On Behalf of the West Virginia Subclass Against All Defendants)

189.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

190.    By their acts and omissions resulting in the manufacture and distribution of contaminated Valsartan to patients in West Virginia, the Defendants violated and continue to violate one or more applicable West Virginia statutes. Including but not limited to Sections 22-11-1 *et seq.* and 46A-6-101 *et seq.* of the West Virginia Code, constituting negligence *per se*, including liability for all appropriate medical monitoring for Plaintiff Howard and the other members of the West Virginia Subclass.

191.    The Defendants' violation of the law proximately caused and continues to proximately cause damage to Plaintiff Howard and members of the West Virginia Subclass in the

form of bodily injury for which Defendants are liability, including liability for all appropriate medical monitoring of Plaintiff Howard and members of the West Virginia Subclass.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant Plaintiffs and all Class members the following relief against Chase:

A.     An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class and Subclasses, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class and Subclasses;

B.     The establishment of a medical monitoring program, funded by the Defendants, for all members of the Class and Subclasses;

C.     The establishment of a science board, funded by the Defendants, to conduct additional research on the future impact of the contaminated Valsartan on members of the Class and Subclasses, in order to improve the effectiveness of the medical monitoring program;

D.     An award of attorneys' fees and costs to counsel for Plaintiffs and the Class and Subclasses;

E.     Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts so triable.

Dated:  May 3, 2019                    By:   _/s/ Steven C. Babin, Jr._

- 33 -

Steven C. Babin, Jr. (admitted *pro hac vice*)
BABIN LAW, LLC
Email:  steven.babin@babinlaws.com
1320 Dublin Road, Suite 100
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

MEYER WILSON CO., LPA
Matthew R. Wilson
Email:  mwilson@meyerwilson.com
Michael J. Boyle, Jr.
Email:  mboyle@meyerwilson.com
1320 Dublin Road, Ste. 100
Columbus, OH  43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066

Brett Vaughn (admitted pro hac vice)
HOLLIS LAW FIRM
Email:  brett@hollislawfirm.com
510 W. 95th Street
Prairie Village, KS 66207
Telephone: (913) 385-5400
Facsimile:  (913) 385-5402

*Attorneys for Plaintiffs and the Proposed Class and
Subclasses*